[L.A. No. 30507. In Bank. Feb. 20, 1976.]

CITY OF TORRANCE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
FUJITA CORPORATION USA, Real Party in Interest.

**COUNSEL**

Stanley E. Remelmeyer, City Attorney, Richard L. Riemer and Ralph H. Nutter for Petitioner.

No appearance for Respondent.

Wells & Herring, Oliver, Stoever & Laskin and W. G. Wells for Real Party in Interest.

**OPINION**

**SULLIVAN, J.**—The City of Torrance, a municipal corporation (the City) seeks a peremptory writ of mandate commanding respondent superior court to dismiss an action in eminent domain brought by the City against real party in interest Fujita Corporation USA (Fujita). The Court of Appeal for the Second Appellate District, Division Five, issued an alternative writ, and Fujita filed a return by demurrer and answer. (See Cal. Rules of Court, rule 56(c).) For the reasons set forth below we deny the petition and discharge the alternative writ.

The facts, as established by the pleadings and substantially uncontroverted declarations made under penalty of perjury, are as follows. In

1972 the City's council adopted a resolution, which has never been amended or revoked, directing the city attorney to undertake condemnation proceedings against several landowners in order to extend two streets. In 1973, pursuant to this resolution, the city attorney filed an action in eminent domain to acquire 2 narrow strips of land (amounting to some 3 acres) running along the northern and western borders of a certain 27-acre parcel owned by Starlite Estates. In September of that year Fujita, the owner and developer of an adjacent 28-acre parcel, agreed to buy Starlite's parcel in the course of the latter's bankruptcy proceedings subject to Fujita's approval of title.

In November 1973 Fujita, having learned of the City's lis pendens, entered into discussions with city officials, taking the position that it would not proceed with the purchase unless the action was dismissed or unless Fujita received firm assurances from the City that the latter would proceed expeditiously to acquire the strips in question. The city attorney gave the requisite assurances and represented that an updated appraisal and offer would be forthcoming within four weeks. Accordingly, Fujita proceeded with plans to expand its contemplated development so as to include the subject parcel and commenced engineering studies to integrate the street, sewer, and utility systems. Apparently there was to be no access from the streets to be built by the City to the Fujita parcels and a "loop system" of internal streets was required.

Early in December 1973 the city attorney advised Fujita that the appraisal and offer would be late and would not be available until after the first of the year. At this time Fujita again emphasized that it was purchasing the property on the understanding that the City desired to proceed with the condemnation proceedings, and was informed by the city attorney that the City's plans had not been changed. Subsequent conversations in February and April 1974 were to the same effect, although by April 15, when the escrow closed and Fujita acquired the property in the course of the bankruptcy proceedings, the appraisal and offer had still not been made. Surveying, engineering, and grading activities went on in contemplation of the enlarged development. In May of 1974 Fujita filed its answer to the complaint in eminent domain, in which it alleged upon information and belief that "there exists an uncertainty about the future of plaintiff's proposed taking, including the diligent prosecution of this action" and asserted its intention to seek recovery for damages suffered by it due to such delay. About July 1, 1974, a tentative tract map was filed reflecting the location of the proposed streets.

When no appraisal and offer was made by the end of June (in spite of continued protestations from the city attorney that the City fully intended to acquire the strips in question and would soon make its offer), Fujita made a motion to dismiss the eminent domain action. On July 11, 1974, the city attorney stipulated to a court order providing (1) that Fujita's motion to dismiss be withdrawn; (2) that prior to August 1 the City, in compliance with section 7267.2 of the Government Code,[1] should make an offer to acquire the subject property at an amount no less than its then approved appraisal of $165,580 for the two strips in question; and (3) that the first pretrial conference should be held on August 21, at which time the parties should select a trial date within 90 days thereafter.

This order was not complied with. On August 6, 1974, upon making inquiry of the city attorney as to when it might expect the offer contemplated by the order, Fujita was told by the city attorney that he then favored abandonment of the eminent domain proceedings. When reminded of his prior representations the city attorney made statements to the effect that his duty to the City required him to obtain the subject property by any legal means. These statements had apparent reference to a then-recent determination on the part of the City to obtain the property without cost by requiring dedication of the areas in question—which were still contemplated for use as streets—as a condition of approval of Fujita's proposed subdivision on the parcel of which they formed a part.[2]

---

[1] Government Code section 7267.2 provides: "Before the initiation of negotiations for real property, the public entity shall establish an amount which it believes to be just compensation therefor, and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the public entity's approved appraisal of the fair market value of such property. . . . The public entity shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount it established as just compensation. . . ."

[2] Subsequent events confirmed the existence of this determination. On August 27, 1974, shortly after the filing of the notice of abandonment (see *infra*), the City adopted its master plan of circulation which showed the condemned property as a part of the projected street system. In September, Fujita was told by the city planning director that its proposed tentative map would not be accepted or acted upon unless it was revised to show dedication of the two strips in question without cost to the City. In December of 1974 an environmental impact report review for the project was filed by the city attorney which indicated that references in the EIR to condemnation should be deleted and replaced with references to dedication. ("Benefit will run to the project as streets are planned and dedication thereof *will* be required." (Original italics).) Finally, on July 16, 1975, the development was rejected by the planning commission due to Fujita's failure to make the indicated dedication.

⸏ On August 13, 1974, the City served and filed a notice of abandonment pursuant to Code of Civil Procedure section 1255a, subdivision (a).[3] Fujita then moved to set aside the abandonment under subdivision (b) of the same section, which provides: "The court may, upon motion made within 30 days after such abandonment, set aside the abandonment if it determines that the position of the moving party has been substantially changed to his detriment in justifiable reliance upon the proceeding and such party cannot be restored to substantially the same position as if the proceeding had not been commenced." On November 18, 1974, the motion was granted and the abandonment set aside, the court's formal order expressly setting forth its finding that the two requirements of subdivision (b) had been met.

Four days after the filing of the formal order setting aside the abandonment, dates were set for the bifurcated trial of the eminent domain action. On the eve of the trial of legal issues the City filed a notice of appeal from the order setting aside the abandonment and moved to continue the trial of the legal issues pending determination of the appeal. The latter motion was denied; the trial of legal issues proceeded and was concluded. On February 19, 1975—which was 93 days after the filing of the minute order granting the motion to set aside the abandonment—the City filed this application for a writ of mandate in the Court of Appeal to compel the trial court to dismiss the underlying action in eminent domain. The Court of Appeal granted an alternative writ and thereafter ordered the issuance of a peremptory writ of mandate directing respondent court to vacate its certain order dated December 5, 1974, setting aside the City's abandonment of the underlying condemnation action entitled City of Torrance v. Starlite Estates et al., No. C 46766 and directing respondent court to take such further action as would be consistent with the views expressed in the opinion of the Court of Appeal. We granted a hearing in this court upon the petition of Fujita.

■ We first proceed to determine whether mandate is the appropriate remedy in this case. "A writ of mandate 'may be issued . . . to compel the performance of an act which the law specially enjoins, . . .' (Code Civ. Proc., § 1085). The writ must be issued where no 'plain, speedy, and adequate remedy' is otherwise available. (Code Civ. Proc., § 1086.) 'It is well settled that *mandamus* will not lie to control the

---

[3]Subdivision (a) provides in relevant part: "The plaintiff may abandon the proceeding at any time after the filing of the complaint and before the expiration of 30 days after final judgment, by serving on defendants and filing in court a written notice of such abandonment. . . ."

discretion of a court or judicial officer or to compel its exercise in a particular manner, except in those rare instances when under the facts it can be legally exercised in but one way [citations].' *(Hilmer* v. *Superior Court* (1934) 220 Cal. 71, 73 . . . .) (See *Lissner* v. *Superior Court* (1944) 23 Cal.2d 711, 715 . . .; *Bales* v. *Superior Court* (1942) 21 Cal.2d 17, 25 . . . .)" *(Mannheim* v. *Superior Court* (1970) 3 Cal.3d 678, 685 [91 Cal.Rptr. 585, 478 P.2d 17]; see also *Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574, 579 [114 Cal.Rptr. 106, 522 P.2d 666]; *Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 850-851 [92 Cal.Rptr. 179, 479 P.2d 379].) Here the facts are established without essential dispute. The sole issue is whether those facts presented to respondent court were sufficient, as a matter of law, to permit the setting aside of an abandonment pursuant to subdivision (b) of Code of Civil Procedure section 1255a. If they were not, the trial court was under a legal duty to deny the motion to set aside and to dismiss the action, and it may be directed to perform that duty by writ of mandate. The absence of another adequate remedy was determined for purposes of this proceeding by the Court of Appeal when it granted the alternative writ. (See *Miller* v. *Superior Court* (1968) 69 Cal.2d 14, 17 [69 Cal.Rptr. 583, 442 P.2d 663], and cases there cited; *Hurtado* v. *Superior Court, supra,* 11 Cal.3d 574, 579; *Mannheim* v. *Superior Court, supra,* 3 Cal.3d 678, 686; cf. *City of Culver City* v. *State Bd. of Equalization* (1972) 29 Cal.App.3d 404, 411-412 [105 Cal.Rptr. 602].)

Section 1255a of the Code of Civil Procedure, relating to the abandonment of condemnation proceedings, was enacted by the Legislature in 1911. (Stats. 1911, ch. 208, pp. 377-378.) Although slightly amended in 1933 (Stats. 1933, ch. 254, p. 790), it contained no provision relating to the setting aside of abandonments until 1961, when it was substantially amended to include four subdivisions, including the present subdivision (b). (Stats. 1961, ch. 1613, pp. 3449-3450.)[4] However, prior to that date there had developed a body of case law, based upon principles of equitable estoppel, which precluded abandonment in cases where the condemnee had incurred substantial costs in reasonable reliance upon the condemnor's actions. Thus, in *Times-Mirror Co.* v. *Superior Court* (1935) 3 Cal.2d 309 [44 P.2d 547], we issued a writ of mandate requiring the trial court to proceed with abandoned condemnation proceedings relating to the condemnee's existing newspaper plant when it appeared

---

[4]The section was further amended, in a manner not here relevant, in 1968. (Stats. 1968, ch. 133, p. 348.) In 1975, as a part of a comprehensive revision of the eminent domain law, it was further amended in a manner not here relevant and renumbered as section 1268.510. (Stats. 1975, ch. 1275, § 2, p. —, No. 9 West's Cal. Legis. Service, p. 3676, No. 8 Deering's Adv. Legis. Service, p. 692).

that the condemnee had built a new plant in a new location in reliance upon the eminent domain action and the condemnor's representations and actions. Similarly, in *McGee* v. *City of Los Angeles* (1936) 6 Cal.2d 390 [57 P.2d 925], we reversed a judgment entered upon the condemnor's demurrer to a complaint seeking recovery of the amount awarded in a condemnation action which had been abandoned following the interlocutory decree; again the condemnee had erected a new building (after demolishing its existing one) in reliance upon the eminent domain action and representations, contained in a stipulation, that its existing building would be destroyed by the contemplated project.

In *People* v. *Superior Court* (1941) 47 Cal.App.2d 393 [118 P.2d 47, 120 P.2d 655], on the other hand, the Court of Appeal issued a writ of mandate requiring dismissal of a condemnation action following abandonment where the trial court had refused to order such dismissal, basing its refusal upon a plea of equitable estoppel arising out of physical operations upon the subject property undertaken under an order of immediate possession; the *Times-Mirror* case was distinguished on the ground that there had been no change of position in reliance on the part of the condemnee, who was left to his remedy for damages on principles of inverse condemnation. This court denied a hearing, over the strenuous dissent of two of its members who were of the view that section 1255a was never meant to be applied to a situation in which the condemnor had taken possession of the subject property and had completed its contemplated improvement. In these circumstances, the dissenters argued, "[t]here is no logical reason, just or otherwise why the defendants should be compelled to initiate an action on their own behalf to obtain the just compensation to which they are apparently entitled under the constitutional guarantee." (47 Cal.App.2d at pp. 401-402.)

It was in this decisional context that subdivision (b) of section 1255a was enacted in 1961. The available legislative history—i.e., that contained in the "Recommendation and Study relating to Taking Possession and Passage of Title in Eminent Domain Proceedings" issued by the California Law Revision Commission in 1960—suggests that situations involving immediate possession (such as that in *People* v. *Superior Court, supra*, 47 Cal.App.2d 393) were foremost in the mind of the Legislature at the time.[5] However, certain broad language in the Recommendation

---

[5] As indicated, the title of the Law Revision Commission report was "Recommendation and Study relating to Taking Possession and Passage of Title in Eminent Domain Proceedings." The study portion of the report provided in relevant part: "Under Code of Civil Procedure Section 1255a the condemnor may abandon the condemnation

and Study (italicized in fn. 5, *ante*), and more especially the comprehensive and general terms of the enactment itself, convince us that a broader legislative purpose was here operative. If it had been the intention of the Legislature merely to insure that the principles of equitable estoppel applied in *Times-Mirror* not be foreclosed from operation in cases involving orders of immediate possession, it could easily have so stated. Instead it adopted a general principle, based on considerations of equity, which was clearly designed to be applied in a broad range of circumstances not limited to those involving immediate possession by the condemnor. The language was simple, direct, and expansive, investing in the trial court the power to set aside an abandonment "if it determines that the position of the moving party has been substantially changed to

proceeding at any time after filing the complaint and before the expiration of 30 days after final judgment. Although there is no statutory restriction that precludes abandonment of the proceeding after the condemnor has entered upon the property under the power of immediate possession, *case law prevents abandonment by the condemnor to a limited extent on an estoppel theory if the condemnee has relied upon the condemnor's prior action and incurred substantial costs.* [Citing the *Times-Mirror* case.] Moreover, under Article I, Section 14 of the State Constitution and Code of Civil Procedure Section 1255a, the condemnor may be liable for the damages suffered and for certain costs incurred by the condemnee. This protection, however, is very limited. Article I, section 14, grants the condemnee a right to damages only when the abandonment is the result of a determination that there is no necessity for the taking; abandonment for any other reason apparently does not support a claim for damages. Section 1255a grants the condemnee the right to reimbursement only for attorney and appraisal fees and other costs of preparing for the action. *There are cases, therefore, when an abandonment would work a particular hardship on a condemnee and yet the condemnee may be denied adequate relief.* Furthermore, the problem becomes *particularly acute* when the property owner withdraws the deposit and reinvests or otherwise disposes of it. In California, *unless the condemnor has done some additional act which would estop him,* he can abandon with near impunity." (Italics added; fns. omitted.) (Cal. Law Revision Com. Recommendation and Study relating to Taking Possession and Passage of Title in Eminent Domain Proceedings (Oct. 1960) p. B-47.)

The recommendation of the commission was as follows: "Under existing law, even though the condemner has taken possession and constructed the contemplated improvement on the property, the condemner may abandon the proceedings at any time until 30 days after final judgment and get back the money it deposited. It is true that the condemner must compensate the owner for the use of the property and any damage to it. But the land owner who has been forced to give up his home or his business and to relocate in another area may find that it is as great a hardship to be forced, in effect, to buy back the original property as it was to be forced to move initially. The deposit may have been withdrawn and expended in the acquisition of a new location; the good will of the business may have been re-established in the new location; or the original property may be so altered that it is no longer useful to the condemnee. [¶] *The Commission recommends that if the condemnee has substantially changed his position in justifiable reliance upon the condemnation proceeding and cannot be restored to his original position, the condemner should not have the right to abandon the condemnation.* If in other cases the condemnation is abandoned or is not completed for any other reason, provision should be made for compensating the condemnee for the damage he has suffered and for any loss or injury to his property that may have occurred while the plaintiff was in possession." (*Id.,* at p. B-9; italics added.)

his detriment in justifiable reliance upon the proceeding and such party cannot be restored to substantially the same position as if the proceeding had not been commenced." (Code Civ. Proc., § 1255a, subd. (b).)

Only two cases have been decided by the appellate courts since 1961 which might be said to relate to the question before us. The first, *Hilltop Properties* v. *State of California* (1965) 233 Cal.App.2d 349 [43 Cal.Rptr. 605, 37 A.L.R.3d 109], did not involve abandonment at all but was concerned with the enforcement of a written agreement by the state to purchase certain property for highway widening purposes. In light of the circumstances, which included improvement of the remainder of the property to leave the portions in question unuseable for anything but freeway purposes, the Court of Appeal held that the state might be bound, under the principles of promissory estoppel, to abide by its agreement; *Times-Mirror* and *McGee* v. *City of Los Angeles, supra,* 6 Cal.2d 390, were cited and discussed for purposes of analogy. (233 Cal.App.2d at pp. 367-369.) The second case, *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345], was an action in inverse condemnation following abandonment of eminent domain proceedings. There no motion to set aside the abandonment had been made under subdivision (b), but this court took the occasion to explain the relationship between the three subdivisions of section 1255a as follows: "Section 1255a, subdivision (a) . . . contemplates instances in which the governmental entity [brings an action in eminent domain which it may even have pursued] to judgment and yet *elects not to convert private property to public use.* The section, therefore, provides the flexibility necessary to protect the public plaintiff from being required to take *property it no longer needs.* [¶] However, the provision is manifestly open to abuse and for that reason subdivisions (b) and (c) provide some protection for property owners. Subdivision (b) allows the defendant to set aside the abandonment on estoppel principles if the position of the defendant 'has been substantially changed to his detriment in justifiable reliance' upon the condemnation action. (Cf. *McGee* v. *City of Los Angeles* (1936) 6 Cal.2d 390, 392 . . . [demolished building].[6]) [¶] In those instances in which there has been no detrimental reliance, subdivision (c) compensates the property owner for some of his costs and expenses in anticipation of an eminent domain trial. . . ." (8 Cal.3d at p. 56; italics added.)

Neither of the foregoing cases provide us with significant guidance in determining the question before us. ■ As we have indicated, the

---

[6] Bracketed material (demolished building) in original.

broad language of subdivision (b) invests in the trial court the power to set aside an abandonment if it finds the presence of the two elements there set forth, to wit: that the moving party (1) has substantially changed his position "to his detriment in justifiable reliance upon the proceeding," and (2) "cannot be restored to substantially the same position as if the proceeding had not been commenced." We find no indication in the legislative history or in the cases decided subsequent to the enactment of the statute that the court's determinations under this standard are to be tied to the particular factual circumstances of cases decided on general equitable principles prior to the enactment of the statute.[7] Accordingly we conclude that the trial court is free to make its determinations under subdivision (b) within the broad terms of the statutory language.

■■ In the instant case the facts as presented to the trial court provide ample ground for its finding that the two requirements of the statute had been met. Those facts, as the trial court impliedly found them, are as follows: Fujita, which was developing a certain parcel of land for residential purposes, learned that an adjoining parcel had become available through the bankruptcy court. Considering the possibility of expanding its development to include the second parcel, it learned that the City had commenced eminent domain proceedings to acquire two strips along the borders of the parcel for the purpose of constructing a limited-access street. Taking the position that it would not acquire the second parcel unless the City either proceeded with the acquisition or abandoned it, allowing Fujita to develop the parcel in its entirety, it was repeatedly assured by the City that acquisition would proceed. It thereupon proceeded to acquire the parcel and to integrate it into its development, omitting the portion thereof that was subject to condemnation. Engineering, grading, and installation of utilities proceeded, with City approval. After repeated delays on the part of the City in providing an offer, Fujita, for the purpose of applying pressure, filed a motion to dismiss the action, which motion was eventually withdrawn upon a stipulation and order requiring the prompt submission of an offer. Rather than submit such an offer, however, the City conceived the plan of abandoning the eminent domain action and requiring the subject property to be dedicated to the City at no cost as a condition of approval of plans for the project. This it proceeded to do.

---

[7] Our citation of *McGee v. City of Los Angeles, supra,* 6 Cal.2d 390, in our *Klopping* opinion was, we note, significantly preceded by a "Cf." signal. Other language in that case, on the other hand, suggests that the condemnor's intentions concerning the condemned land are to be taken into consideration (see italicized language in paragraph next preceding).

The trial court, on the basis of these facts, granted the motion to set aside the abandonment pursuant to Code of Civil Procedure section 1255a, subdivision (b), finding "that the position of defendant Fujita Corporation USA, the moving party herein, has been substantially changed to its detriment in justifiable reliance upon this proceeding and that Fujita Corporation USA cannot be restored to substantially the same position as if the proceeding had not been commenced." We cannot say—as we must if we are to issue the writ of mandate here sought—that these findings are beyond the power of the court to make on the basis of the evidence before it.

We find it unnecessary to make a detailed response to the City's contentions, based upon its version of the evidence, that Fujita's change of position did not result from justifiable reliance upon the actions and representations of the City and that Fujita can now be restored to its original position.

There was ample evidence in the record before the trial court to support an implied finding[8] that Fujita would not have purchased the property in question, or undertaken its physical incorporation into its ongoing development on adjacent land, absent the City's repeated and emphatic assurances that it had every intention of prosecuting its eminent domain action to final judgment; that such assurances were made with full and complete awareness of Fujita's reliance upon them and with the intention of encouraging such reliance; that Fujita's reliance was justifiable in light of all of the circumstances; that the City's subsequent determination to acquire the property it sought by requiring its dedication as a condition of approval of Fujita's expanded project was made in bad faith; and that Fujita could not be restored to substantially its prior position. The City's contention that Fujita's reliance was not justifiable because it knew at all times that the City, in spite of its assurances, retained the power to abandon the action amounts to nothing more than a refusal to acknowledge the existence of the statutory power exercised by the trial court.

Of equal validity is the assertion that the City's conduct finds support in the decision of this court in *Ayres* v. *City Council of Los Angeles* (1949) 34 Cal.2d 31 [207 P.2d 1, 11 A.L.R.2d 503], wherein we held that a city

---

[8]No findings of fact and conclusions of law were requested by any party to this proceeding. (See Code Civ. Proc., § 632.) The trial court's order, as indicated in the preceding paragraph, set forth the ultimate findings contemplated by section 1255a, subdivision (b).

may properly condition its approval of a subdivision map upon the dedication of property for the improvement of public streets. Suffice it to say, as we did on page 42 of our *Ayres* opinion, that that case did not arise in the context of an existing eminent domain proceeding. To say that the City might have required dedication of the property here in question as a condition of approval of the Fujita project at some point prior to its institution of eminent domain proceedings is certainly not to say that it retains that power indefinitely and without regard to subsequent actions and developments. To so maintain is simply another means for ignoring the clear message of our *Times-Mirror* and *McGee* cases and the provisions of section 1255a, subdivision (b).

■ We also reject the City's contention that the abandonment should not be permitted to be set aside in these circumstances because Fujita can be compensated for any loss by one of two alternative remedies which would not have the effect of interfering with executive decisions concerning condemnation—to wit, an action for damages in inverse condemnation, or recovery under subdivision (c) of section 1255a for its costs and expenses. It is manifest that the latter remedy, which as we said in *Klopping* applies to "those instances in which there has been no detrimental reliance" (8 Cal.3d at p. 56), would take no account of Fujita's loss, under the City's new position, of the value of the strips whose acquisition by the City was to be effected by eminent domain. An action for inverse condemnation would entail a new lawsuit. The inevitable delays attendant upon such a proceeding would have the practical effect of forcing Fujita to make the dedication which the City now demands in order to proceed with its project.[9] There might also be substantial problems of waiver arising from such dedication.

The City makes much of the fact that Fujita made a motion to dismiss the condemnation action, alleging the imminence of the same kind of damages which it later cited in support of its motion to set aside the abandonment. There is, however, no inconsistency in these actions. From the very first day of contact with the City, Fujita consistently maintained the same position: it wanted the City either to dismiss the action and let it use its land as it wished or to prosecute the condemnation action promptly. The one thing Fujita wanted to avoid was having the development of its property delayed during protracted

---

[9] It is alleged without contradiction that Fujita has incurred and continues to incur over $675 per day in interest, taxes and carrying charges on the Starlite Estates property while it awaits the resolution of the condemnation action, which was commenced almost three years ago.

litigation. The City's accusation of deceit ignores the fact that the circumstances had changed fundamentally between the time Fujita filed the motion to dismiss and the time it filed the motion to set aside the abandonment. In the interim Fujita had learned that the City had changed its tactics and planned to prevent development until Fujita dedicated the streets. At that point, Fujita could no longer afford to have the action dismissed.

Finally, it is urged that subdivision (b) of section 1255a is unconstitutional as here applied because "it results in delegation to the judiciary and to a private owner of land the power to dictate whether or not a particular improvement is to be completed and to interfere with the determination by the City Council as to the location or relocation of such an improvement"—all in violation of article XI, section 11, of the state Constitution. The cited section provides, in subdivision (a), that "[t]he Legislature may not delegate to a private person or body power to make, control, appropriate, supervise or interfere with county or municipal corporation improvements, money, or property, or to levy taxes or assessments, or perform municipal functions." It is manifest, however, that subdivision (b) of section 1255a results in no delegation of municipal functions to a "private person or body." That provision simply requires a public entity which, having commenced proceedings in eminent domain to acquire private property for public purposes, thereby and through its subsequent course of conduct induces detrimental and justifiable reliance of an irreversible nature on the part of the condemnee, to pursue those proceedings to their conclusion. The power to use or not use the property thus acquired in the location of public streets and improvements remains wholly intact.

As we indicated in *Klopping,* section 1255a of the Code of Civil Procedure was designed to provide "the flexibility necessary to protect the public plaintiff from being required to take property it no longer needs." (8 Cal.3d at p. 56.) However, as we also observed, "the [basic] provision is manifestly open to abuse" (*id.*) and therefore contains certain protective features, subdivision (b) being foremost among them. In the instant case we are met with a flagrant case of such abuse—to wit, an attempted use of the power of abandonment *not to prevent acquisition of unwanted land but to force dedication of land still contemplated for public use.* In the circumstances of this case, wherein the condemnee has purchased and begun to develop land in reliance upon a condemnation action and repeated representations concerning its integrity, and where the sole reason for abandonment is to require the condemnee to donate

what the condemnor had committed itself to buy, the provisions of subdivision (b) are clearly available to require that the condemnor proceed with his action.

The alternative writ of mandate is discharged and the petition for a peremptory writ is denied. Real party in interest shall recover its costs in an amount to be determined by the trial court.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Richardson, J., concurred.

On March 19, 1976, the opinion and judgment were modified to read as printed above.